ARKANSAS-OKLAHOMA GAS CORP. *v.* LUKIS
STEWART PRICE FORBES & CO. LTD., Ebasco Risk
Management Consultants Inc.; et al.

90-344                                   816 S.W.2d 571

Supreme Court of Arkansas
Opinion delivered September 23, 1991

*Wilson, Engstrom, Corum & Dudley*, by: *Timothy O. Dudley*, for appellant.

*Warner & Smith*, by: *Joel D. Johnson*, for appellee Instituto Nacional de Seguros.

*J. Michael Shaw* and *P.H. Hardin*, for appellees-insurers.

ROBERT H. DUDLEY, Justice. A group of insurance companies, the appellees, provided surplus lines of liability insurance to appellant Arkansas Oklahoma Gas Corporation. A gas explosion resulted in judgments of $8,000,000 against AOG and it, in turn, looked to the insurers for coverage. By that time, five (5) of the surplus lines insurers had become insolvent. The solvent ones paid

their proportionate, or several, shares of the loss, but refused to pay the insolvent insurers' shares. Eventually, AOG filed suit and alleged that each insurer was jointly liable for the whole loss. In a summary judgment proceeding, the trial court held that the appellee insurance carriers were severally liable only. AOG appeals. We affirm.

For many years AOG had purchased its liability insurance thorough Rebsamen Insurance, Inc. of Little Rock. Charles Campbell, the Executive Vice President of Rebsamen Insurance and a licensed surplus lines insurance broker in Arkansas, handled the AOG account. In 1976, both Campbell and AOG knew that AOG's liability insurance would expire in 1977. Before the policies expired, Campbell sought to obtain new ones. He obtained $500,000 in primary liability insurance coverage from the USF&G companies. He obtained $1,000,000 in excess liability coverage from Gas, Ltd., later known as AEGIS. Finally, he sought to obtain $9,000,000 in excess liability coverage. At that time, it would have been extremely difficult, if not impossible, to obtain that much excess liability coverage from companies authorized to do business in Arkansas, and it was no easy task to obtain that much excess liability coverage, even looking to alien and foreign unauthorized companies.

Campbell contacted Ebasco Risk Management Consultants in New York. He knew that Ebasco had provided risk management insurance services for utilities for over forty (40) years. A sketch of its program is as follows: Various utilities would contact Ebasco about excess liability insurance. Ebasco would contact Lukis Stewart Price Forbes & Co., a Toronto, Canada broker. Lukis Stewart would then contact its parent company in London, England, "The Sedgwick Group." The Sedgwick Group would put together an excess liability insurance program by procuring insurance from various syndicates and underwriters at Lloyd's and from other insurance companies located in London and from still others around the world. The policy would be in the form of a master policy for the Ebasco group excess liability program and would be known as the "Ebasco slip." Lloyd's syndicate insurers and other insurers would provide in the master policies that each insurer's liability was several. The master policies would be delivered to Lukis Stewart and then to Ebasco. The master policy would authorize Lukis Stewart to issue a memorandum of excess

liability insurance to Ebasco, and Ebasco would then send the memorandum to the local agent for each utility. Each utility was separately rated for the purpose of computing premiums. In summary, Ebasco held the master policy for each of the separately rated utilities in the group of insured utilities.

At the time relevant to this case, Lloyd's syndicates were on the "Ebasco slip" for a total of 25.75 percent of the excess liability insurance and other combined companies were on the slip for a total of 74.25 percent. The two master policies provided that the insurers are severally liable only. The master policy by the underwriters at Lloyd's provides:

> Now know Ye that We the Underwriters, Members of the Syndicates whose definitive numbers in this after-mentioned List of Underwriting Members of Lloyd's are set out in the attached Table, hereby bind ourselves each for his own part and not one for another, our Heirs, Executors and Administrators and in respect of his due proportion only, to pay or make good to the Assured or to the Assured's Executors or Administrators or to indemnify him or them against all such loss, damage or liability as herein provided, after such loss, damage or liability is proved and the due proportion for which each of Us, the Underwriters, is liable shall be ascertained by reference to his share, as shown in the said List, of the Amount, Percentage or Proportion of the total sum insured hereunder which is in the Table set opposite the definitive number of the Syndicate of which such Underwriter is a Member AND FURTHER THAT the List of Underwriting members of Lloyd's referred to above shows their respective Syndicates and Shares therein, is deemed to be incorporated in and to form part of this Policy, bears the number specified in the attached Table and is available for inspection at Lloyd's Policy Signing Office by the Assured or his or their representatives and a true copy of the material parts of the said List certified by the General Manager of Lloyd's Policy Signing Office will be furnished to the Assured on application.

The combined companies' master policy provides:

> Now know ye that we the Assurers do hereby bind

ourselves, each COMPANY for itself only and not one for another and in respect only of the due proportion of each Company, to pay to the Assured or the Assured's Executors or Administrators, all such loss, damage or liability as herein provided that the Assured may sustain during the stated period, not exceeding in all the sum insured, as properly apportioned to the sums, or to the percentages or proportions of the sum insured, subscribed against our names respectively.

The policies further provide "that Lukis Stewart Price Forbes & Co. Ltd. may issue evidence of coverage to each Assured." Lukis Stewart issued two "memoranda of excess liability insurance," one representing the group of Lloyd's syndicates participating in 25.75 percent of the risk and the other representing the combined companies' 74.25 percent of the risk. Neither memorandum provided whether liability was joint or several. The memoranda were sent to Ebasco in New York and then forwarded to Charles Campbell of Rebsamen Insurance in Little Rock and finally to AOG.

On June 21, 1978, while the policies were in force, a natural gas explosion caused personal injuries that resulted in judgments against AOG totaling $8,000,000.

The primary carrier, USF&G, paid the $500,000 limit of its policy. AEGIS paid the $1,000,000 limit of its excess liability coverage. All of the Lloyd's underwriters paid their several amounts in full. This amounted to 25.75 percent of the loss. Most of the "other companies" paid their percent of the loss, but five of the "other companies," representing $543,514.49 of the loss, were insolvent and did not pay.

AOG demanded indemnity from the solvent insurers. They refused to pay more than their several shares. AOG then filed suit against Rebsamen Insurance, Ebasco, Lukis Stewart, and the excess liability insurers. In its complaint, it pleaded that Rebsamen, Ebasco, and Lukis Stewart were its agents and, as such, were negligent in their selection of the insurance companies. That part of AOG's suit has not been decided and is not before us in this appeal. AOG additionally pleaded that the Lloyd's syndicates and the other companies are jointly liable under three theories: (1) operation of law, (2) breach of contract, and (3) negligence.

AOG and the insurance companies both filed motions for summary judgment. Four volumes of record, consisting of interrogatories, requests for admissions, answers to interrogatories and admissions, affidavits, exhibits, and depositions were filed along with the motions. After reviewing them, the trial court ruled in favor of the insurance companies and issued an ARCP Rule 54(b) certification that allows us to accept the appeal of the partial summary judgment.

As a preliminary matter, all parties agree that Arkansas law is applicable to this case, and it is appropriate to cite today's Arkansas Code Annotated, rather than 1977's Arkansas Statutes Annotated, since none of the statutes involved have been amended.

AOG first argues that the insurance companies are jointly and severally liable as a matter of law. Its argument is based on Ark. Code Ann. § 23-79-117(b) (1987) which provides:

(b) Two (2) or more insurers may, with the approval of the commissioner, issue a combination policy which shall contain provisions substantially as follows:

(1)     That the insurers executing the policy shall be severally liable for the full amount of any loss or damage according to the terms of the policy, or for specified percentages or amounts thereof aggregating the full amount of insurance under the policy; and

(2)     That service of process or of any notice or proof of loss required by the policy upon any of the insurers executing the policy shall constitute service upon all the insurers.

AOG argues that the statute plainly means that in order to limit liability under a policy to several liability, the insurers must have obtained the approval of the Arkansas Insurance Commissioner. The appellee insurance companies did not have the approval of the Commissioner to issue these policies, and, for that reason, AOG contends they are jointly liable as a matter of law. AOG's argument would have merit if the cited statue were the controlling statute.

The cited statute, Ark. Code Ann. § 23-79-117(b), is

part of the general insurance code. Another section of the insurance code deals with "surplus lines insurance," the particular kind of insurance at issue in this case.

Ark. Code Ann. § 23-60-105 (1987) provides:

> Provisions of this code relative to a particular kind of insurance or a particular type of insurer or to a particular matter shall prevail over provisions relating to insurance in general or insurers in general or to such matters in general.

Consequently, the specific provisions of the Arkansas Surplus Lines Insurance Law control over the general statute cited by AOG.

Our statutory scheme for surplus lines insurance is based upon the premise that Arkansas insurance brokers at times will be required to look to foreign or alien unauthorized insurers for surplus lines insurance. Accordingly, it regulates Arkansas insurance brokers, not the unauthorized companies with whom they are conditionally authorized to do business. *See* Ark. Code Ann. §§ 23-65-302 and 303 (1987) concerning placing of surplus lines insurance with unauthorized or non-admitted insurers.

In addition, Ark. Code Ann. § 23-65-305 (1987) provides:

> If certain insurance coverages cannot be procured from authorized insurers, coverages, hereinafter designated "surplus lines" may be procured from unauthorized insurers subject to the following conditions:
>
> (1) The insurance must be procured through a licensed surplus lines broker;
>
> (2) The full amount of insurance required must not be procurable, after diligent effort has been made to do so, from among authorized insurers who are actually marketing that kind or class of insurance in this state, and the amount of insurance placed in an unauthorized insurer is only the balance over the amount procurable from authorized insurers.

Ark. Code Ann. § 23-65-310 (1987) provides that a broker may place surplus lines insurance with unauthorized foreign and alien insurers that are approved by the Commissioner. The first

few lines of the statute, which are representative of its full content, provide:

(a) A surplus lines broker shall place surplus lines insurance only with insurers which have been approved by the commissioner. The commissioner may maintain a list of approved foreign and alien surplus lines insurers in addition to those alien insurers maintaining status on the current National Association of Insurance Commissioners' nonadmitted insurers' quarterly listing. The approved list shall not contain:

(1) Any insurer which is not licensed in at least one (1) state of the United States for the kind of insurance involved;

(2) Any stock insurer having capital and surplus amounting to less than three million dollars ($3,000,000);

Ark. Code Ann. § 23-65-311 (1987), places the duty upon the broker to issue and deliver evidence of the insurance to the insured. Of equal importance, it expressly provides that insurers may assume only a proportion of the policy, or several liability. It provides:

(a) Upon placing a surplus lines coverage, the broker shall promptly issue and deliver to the insured evidence of the insurance, consisting either of the policy as issued by the insurer or, if the policy is not then available, the surplus lines broker's certificate. The certificate shall be executed by the broker and show the subject, coverage, conditions, and terms of the insurance, the premium charged and taxes collected from the insured, and the name and address of the insurer. *If the direct risk is assumed by more than one (1) insurer, the certificate shall state the name and address and proportion of the entire direct risk assumed by each such insurer.*

(b) If, after the issuance and delivery of the certificate, there is any change as to the identity of the insurers, *or the proportion of the direct risk assumed by the insurers* as stated in the broker's original certificate, or in any other material respect as to the insurance coverage evidenced by the certificate, the broker shall promptly

issue and deliver to the insured a substitute certificate accurately showing the current status of the coverages and the insurers responsible thereunder.

(c)   If a policy issued by the insurer is not available upon placement of the insurance and the broker has issued and delivered his certificate as provided in subsection (a) of this section, upon request therefor by the insured, the broker shall, as soon as reasonably possible, procure from the insurer its policy evidencing such insurance and deliver such policy to the insured in replacement of the broker's certificate theretofore issued.

(d)   Any surplus lines broker who knowingly or negligently issues a false certificate of insurance, or who fails promptly to notify the insured of any material change with respect to the insurance by delivery to the insured of a substitute certificate as provided in subsection (b) of this section, upon conviction, shall be subject to the penalties provided by § 23-60-108 of this code or to any greater applicable penalty otherwise provided by law. [Emphasis added.]

From the foregoing, it is manifest that the statutory scheme for surplus lines insurance is designed to regulate the registered broker and to authorize the broker, by his certificate, to advise the insured of the names, addresses, and proportion of the risk assumed by each insurer. It provides for several liability of the insurers and does not specify that the surplus lines insurer must comply with the general insurance code provisions.

The Seventh Circuit Court of Appeals addressed a comparable case in *Corday's Dept. Store, Inc. v. New York F.&M. Under., Inc.*, 442. F.2d 100 (7th Cir. 1971). The issue in that case was whether a surplus lines insurer could provide exclusions in its policy which deviated from the statutory required standard form of fire insurance. In Illinois, as in Arkansas, surplus lines insurance is exempt from the statutory requirement of a certificate of authority. The Court of Appeals, in reviewing the object and purposes of surplus lines insurance, stated:

The District Court, recognizing that the object and purpose of surplus line insurance provisions, as elucidated

by the Illinois courts, is to make it possible to secure protection against a risk when authorized companies will not provide that protection, concluded that the regulatory scheme embodied in the Illinois Insurance Code is used to achieve that objective which embraces, as well, the implicit common sense judgment that it is better that a citizen of Illinois be able to insure a risk at less than standard coverage, than that he not be able to secure any protection at all.

*Id.* at 104. The court held that the Illinois statutes setting out the forms of policies were applicable only to authorized companies transacting business in the state but were not applicable to a policy issued by a surplus lines insurer. Likewise, we hold that the statute cited by AOG is a part of the general insurance code and does not govern surplus lines insurance.

■ Secondly, AOG argues that the trial court erred in granting summary judgment against it on its breach of contract claim. The basis for the alleged breach of contract is the language in the memoranda issued by Lukis Stewart that provides the insurers will indemnify AOG for "any and all sums which they shall be legally obligated to pay . . . to any person or persons as damages for personal injuries sustained. . . ." AOG argues that the insurers have failed to pay all such sums, and therefore, have breached their contract. Lukis Stewart issued the memoranda of insurance to its insured, AOG, as brokers are authorized to do. *See* Ark. Code Ann. § 23-65-311. AOG expressly pleaded in its complaint that Lukis Stewart was its agent and, in its brief to the trial court, admitted that the appellee insurance companies were not liable for the acts of its brokers. (AOG still has its claims pending against Lukis Stewart for its alleged wrongful acts as AOG's agent.) In short, under the pleadings and argument of AOG, the memoranda were not contracts with the appellee insurance companies, but instead, are memoranda issued by its own broker. Since it is undisputed that the appellee insurance companies have each severally paid their proportionate amount due under the master policies there was no genuine issue as to any material fact involved in the breach of contract count, and the trial court correctly granted summary judgment on this claim.

■ In the oral argument of this case, AOG argued that

Lukis Stewart was the agent of AOG in some of the matters and was the agent of the insurance companies in others, depending on which party requested it to do the particular act, and this set of facts raised a jury question. *See* 3 G.J. Couch, *Couch Cyclopedia of Insurance Law* § 25:94 (R.A. Anderson, ed., 2d rev. ed. 1983). However, we do not consider this dual agency as it was not raised below.

■ In its final point, AOG argues that the trial court erred in dismissing its negligence claim. In this claim, AOG asserted that its brokers and the appellee insurers negligently led AOG to believe that all of its coverage was placed with underwriters at Lloyd's. However, there is no affidavit or other response which indicates that the appellee insurers made any such representation, and the ruling of the trial court correctly dismissed them from this part of the suit.

■ One of the appellee insurance companies, Instituto Nacional de Seguros, attempts to cross-appeal. This insurance company first asks us to affirm the trial court's ruling that it is not jointly liable and that it has paid all that it severally owed, and that it was correctly dismissed from the lawsuit. It then asks, on cross-appeal, for this court to hold that "the trial court erred in not granting this appellee's motion for summary judgment on the grounds that this appellee was not a participant in the subject insurance policy." Instituto's designation of its procedure as a cross-appeal is in error. A cross-appeal is required only when the appellee seeks some affirmative relief which he failed to obtain in the trial court. A cross-appeal is not necessary when the appellee won the case below and merely asks that the judgment be affirmed on a different basis. *Bowen* v. *Danna*, 276 Ark. 528, 637 S.W.2d 560 (1982). However, when we affirm on direct appeal, as we have done in this case, we need not decide if there are additional reasons to affirm the case. *Id.* at 535-6, 637 S.W.2d at 565. Accordingly, we decline to decide if there are additional grounds on which to affirm the judgment in favor of Instituto.

Affirmed.