CHEMICAL LEAMAN TANK
LINES, INC., Plaintiff,

v.

**THE AETNA CASUALTY AND SURETY CO., Robin Anthony Gildart Jackson, an Underwriter at Lloyd's, London, et al., Defendants.**

Civil Action No. 89–1543.

United States District Court,
D. New Jersey.

Sept. 15, 1997.

---

Willkie Farr & Gallagher by Kevin B. Clark, John P. Dean, and Conrad J. Smucker, Washington, D.C. and Blank Rome Comisky & McCauley by Steven D. Weinstein and J. Llewellyn Mathews, Cherry Hill, NJ, for Plaintiff Chemical Leaman Tank Lines, Inc.

Mendes & Mount, LLP by Henry Lee, New York City, and by Robert F. Priestley, William S. Wachenfeld, Kathleen B. Browne, and Adam M. Smith, Newark, NJ, for Defendants Robin Anthony Gildart Jackson, an Underwriter at Lloyd's, London, et al.

## OPINION ON REALLOCATION OF DAMAGES

BROTMAN, District Judge.

Plaintiff Chemical Leaman Tank Lines, Inc. ("Chemical Leaman") instituted this action against Aetna Casualty and Surety Company ("Aetna") and the London Market Insurers ("LMI"), seeking a declaratory judgment that the defendant insurers were required to provide coverage for costs connected to the environmental cleanup of plaintiff's Bridgeport, New Jersey facility. The jury determined that Chemical Leaman was entitled to partial coverage under several Aetna primary policies and LMI excess policies.[1]

---

1. Opinions by this Court granting partial summary judgment on certain issues are reported at

*Chemical Leaman Tank Lines, Inc. v. Aetna Cas., and Sur. Co.,* 788 F.Supp. 846 (D.N.J.1992), *aff'd,*

Following an appeal by the insurers and an intervening settlement between Chemical Leaman and Aetna, the United States Court of Appeals for the Third Circuit affirmed this Court's post-verdict judgment against the LMI except for its determination of joint and several liability. *Chemical Leaman v. Aetna Cas. and Sur. Co.*, 89 F.3d 976 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996). The appellate court remanded the case to this Court for an apportionment of insurance payments among applicable policies in accordance with an intervening New Jersey Supreme Court decision, *Owens–Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 650 A.2d 974 (1994).

Pursuant to the Third Circuit's remand, this Court opened an allocation proceeding in accordance with *Owens–Illinois*. At the Court's direction, Chemical Leaman and the LMI submitted briefs and presented oral argument concerning the application of the Third Circuit's decision and *Owens–Illinois*. The Court designated the Hon. Joel B. Rosen, United States Magistrate Judge, to conduct intensive settlement discussions in line with the *Owens–Illinois* court's emphasis on the importance of dispute-resolution efforts. *See Owens–Illinois*, 650 A.2d at 995–96. The parties were unable to reach a settlement, and the Court now addresses the allocation issues before it.

## I. *BACKGROUND*

### A. CONTAMINATION AT THE BRIDGEPORT SITE

Chemical Leaman is a tank truck company specializing in the transportation of various chemicals and other liquids. It operates a number of tank truck cleaning facilities around the country, including the subject site in Bridgeport, New Jersey. The company used the Bridgeport site from at least 1960 to 1985 to clean trucks. From 1960 to 1969, Chemical Leaman placed contaminated rinse-water at its Bridgeport facility into a wastewater treatment system consisting of unlined ponds and lagoons. In 1969, the New Jersey

89 F.3d 976 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996); and *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.*, 817 F.Supp. 1136 (D.N.J.1993),

Department of Health responded to community complaints about bad odors and ordered Chemical Leaman to construct a wastewater treatment and/or disposal plant. Chemical Leaman continued to use the pond and lagoons system until 1975, when it installed a water treatment system. By 1977, Chemical Leaman had drained the ponds and lagoons of liquid, dredged the accumulated sludge out of the lagoons, and filled all the ponds and lagoons with brickbat, sand, and concrete.

In 1981, the New Jersey Department of Environmental Protection ("DEP") ordered Chemical Leaman to investigate the extent and degree of groundwater contamination at and around the Bridgeport site. The investigation revealed that the ponds and lagoons were the primary source of groundwater contamination. In 1984, the Federal Environmental Protection Agency ("EPA") placed the site on the Superfund national priorities list pursuant to section 105 of the Comprehensive Environmental Response, Compensation and Liabilities Act ("CERCLA"). The EPA alleged that Chemical Leaman was strictly liable for damages and cleanup costs resulting from the onsite contamination. In July 1985, Chemical Leaman entered into a consent order with the EPA. Chemical Leaman admitted liability under CERCLA and agreed to undertake a Remedial Investigation and Feasibility Study ("RI/FS") of the groundwater. Chemical Leaman has incurred expenses in performing the RI/FS and is further obligated to pay for all costs of removal or remedial action incurred by the United States or the State of New Jersey, as well as for damages for injury to, destruction of, or loss of natural resources. The contamination at Bridgeport involved not only groundwater, but also soil and wetlands.

The tank truck company gave notice of claims to Aetna in April 1988, and to the LMI in March 1989. Aetna and the LMI refused to defend or indemnify Chemical Leaman for costs it had incurred and costs to be incurred in the future in connection with the cleanup of the Bridgeport site.

*aff'd in part and rev'd in part*, 89 F.3d 976 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996).

## B. THE INSURANCE POLICIES

Chemical Leaman purchased comprehensive general liability insurance ("CGL") from Aetna covering successive years, from April 1, 1959 through April 1, 1985. It purchased excess CGL policies covering the same period from the LMI.[2] For purposes of the allocation issues currently before the Court, the Court need not discuss the provisions of the Aetna policies.

The LMI's CGL policies were standard-form "occurrence-based" policies; in other words, the excess policies insured against "occurrences" as defined in the policies. The insuring clause typically provided that the LMI agreed:

[s]ubject to the limitations, terms and conditions [of the policy] to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability ... imposed upon the Assured by law, ... for damages ... on account of: ... (ii) Property Damage ... caused by or arising out of each occurrence.

The LMI policies generally defined an "occurrence" as "[a]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in ... property damage ... during the policy period." From April 1, 1971, through April 1, 1985, each of the LMI's policies contained pollution exclusion clauses barring coverage for discharges of pollutants, unless such discharges were "sudden and accidental" or "sudden, unintended, and unexpected."[3]

## C. PROCEDURAL HISTORY

Chemical Leaman filed this declaratory judgment action in April 1989, after the insurers refused to defend or indemnify it for

costs it had incurred and costs to be incurred in the future in connection with the cleanup of the Bridgeport site. Following extensive discovery and adjudication of numerous motions, this Court tried the case in March 1993.

After a three-week trial, the jury determined that Chemical Leaman was entitled to coverage for investigation and remediation of soil contamination under the April 1, 1960 to April 1, 1971 LMI policies; wetlands contamination under the April 1, 1961 to April 1, 1971 LMI policies; and groundwater contamination under the April 1, 1960 to April 1, 1981 LMI policies.[4] In arriving at the verdict, the jury found that there was continuous, indivisible damage to the three environmental media in policy years at issue. Applying New Jersey's continuous trigger theory, the Court had instructed the jurors they could find property damage occurred during a given policy year if there was proof a continuous, indivisible process of injury occurred during that year. Further, the Court had charged the jury that "Chemical Leaman may be entitled to coverage under the defendants' insurance policies for property damage that occurs during a policy period, but that originally began during an earlier policy period."

Also underlying the jury's verdict was its response to detailed interrogatories on Chemical Leaman's intent and expectation to cause property damage and to discharge pollutants during each policy year. For wetlands, the jury found that while Chemical Leaman did not expect or intend to *cause damage* to the swamp area, it did expect and intend to *discharge pollutants* into this medium in the 1971–78 policy years.[5] Coverage

2. For a discussion of how the London insurance market operates, see *Diamond Shamrock Chemicals Co. v. Aetna Cas. and Sur. Co.,* 258 N.J.Super. 167, 609 A.2d 440, 451 (App.Div.1992), as well as *Edinburgh Assur. Co. v. R.L. Burns Corp.,* 479 F.Supp. 138, 144–45 (C.D.Cal.1979), *aff'd in part and rev'd in part,* 669 F.2d 1259 (9th Cir. 1982).

3. The 1974–77 policies, for example, contained the standard industry pollution exclusion clause, known also as the "ISO" pollution exclusion, which precludes coverage for pollution and con-

tamination unless the "discharge, dispersal, release or escape is sudden and accidental."

4. Similarly, the jury found that Chemical Leaman was entitled to coverage for cleanup of soil contamination under the April 1, 1960 to April 1, 1971 Aetna policies; wetlands contamination under the April 1, 1961 to April 1, 1971 Aetna policies; and groundwater contamination under the April 1, 1960 to April 1, 1981 Aetna policies.

5. The jury found that property damage to the wetlands did not occur until the 1961–62 policy

for wetlands contamination after 1971 was precluded, therefore, because the Court had determined that the 1971–85 LMI policies' pollution exclusion clauses barred coverage for intended or expected discharges of pollutants. With regard to soil, the Court had granted partial summary judgment to the LMI under post–1971 policies upon application of the exclusion clause.

Based on the jury's verdict, the Court entered a judgment order entitling Chemical Leaman to recover "the full amount of any and all costs of investigating and remediating" soil, wetlands, and groundwater contamination at Bridgeport under the liable policies. *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.,* No. 89–1543, j. order (D.N.J. Apr. 7, 1993), *aff'd in part and rev'd in part,* 89 F.3d 976, *cert. denied,* —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996). The 1960–71 LMI (and Aetna) policies were held jointly and severally liable to policy limits for investigation and remediation costs connected to soil damage; the 1961–71 policies, for wetlands damage; and the 1960–81 policies, for groundwater contamination.

The LMI, along with Aetna, appealed this Court's legal determinations, the jury's verdict, and the Court's post-verdict judgment. Following oral argument of the appeal, Chemical Leaman and Aetna settled all claims arising from this dispute.

The Third Circuit subsequently affirmed this Court's judgment as it related to the LMI, except as to this Court's holding that all triggered LMI policies under the verdict were jointly and severally liable. The Court of Appeals noted that in the year following the trial of this matter, the New Jersey Supreme Court in *Owens–Illinois* had rejected joint and several liability in continuous

trigger coverage cases. The New Jersey Supreme Court had instead adopted a risk-based allocation of liability among triggered policies, "i.e., proration on the basis of policy limits, multiplied by years of coverage." *Chemical Leaman,* 89 F.3d at 995 (quoting *Owens–Illinois,* 650 A.2d at 993). The Court of Appeals accordingly remanded the case to this Court solely for a "reallocation of damages among applicable policies" in accordance with *Owens–Illinois. Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.,* 89 F.3d 976, 980–81 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996).

## II. DISCUSSION

### A. RECOVERABLE INDEMNITY COSTS

#### 1. ALLOCATION BETWEEN DEFENSE AND INDEMNITY

A threshold question for this damages allocation is: which of Chemical Leaman's Bridgeport cleanup costs are potentially recoverable under the LMI policies? Chemical Leaman does not dispute the LMI's argument that these excess CGL policies carry only a duty to indemnify, and not a duty to defend.[6] The parties disagree, however, about whether certain cleanup costs are indemnity costs or defense costs.

##### a. Recoverability of RI/FS Costs

The parties' principal disagreement concerns the proper allocation of the costs incurred by Chemical Leaman in performing the RI/FS it undertook at Bridgeport pursuant to its 1985 consent order with the EPA. Chemical Leaman, relying on this Court's 1993 judgment and on the New Jersey Supreme Court's March 1996 decision in *General Accident Ins. Co. v. State, Department of*

---

year, and that a subsequent continuous process of damage terminated during the 1977–78 policy period.

**6.** A duty to indemnify under CGL policies, such as the subject LMI policies, requires the carrier to pay on behalf of the policyholder all sums that the insurer is obligated contractually to pay as damages because of harms or losses covered by the policy. *General Accident Ins. Co. v. State, Department of Environmental Protection,* 143 N.J. 462, 672 A.2d 1154, 1155 (1996). By contrast,

the duty to defend pursuant to these policies "'obligates the insurer to pay the fees of attorneys, investigators and expert consultants who prepare and assist in the defense of lawsuits filed against the policyholder.'" *Id.* (quoting Eileen B. Eglin & Stephen D. Straus, *Classifying RI/FS Costs Under a Policy of Comprehensive General Liability Insurance: Indemnity or Defense?,* 5 Fordham Envtl. L.J. 385, 386 (1994) ("Eglin & Straus")).

*Environmental Protection,* 143 N.J. 462, 672 A.2d 1154 (1996) (*"Fairclough"*), contends that all of its RI/FS costs should be considered recoverable indemnity expenses. The LMI, citing *Endicott Johnson Corp. v. Liberty Mutual Ins. Co.,* 928 F.Supp. 176 (N.D.N.Y.1996), *appeal dismissed,* 116 F.3d 53 (2d Cir.1997), argue for a "fair allocation" of RI/FS costs between defense and indemnity. The *Endicott Johnson* court held that only those RI/FS costs primarily attributable to feasibility studies[7] should be treated as indemnity expenses, while RI/FS costs primarily related to remedial investigation[8] should be deemed defense costs. 928 F.Supp. at 183–84.

The Court first considers Chemical Leaman's argument that the 1993 judgment in this case bars the LMI's argument. Plaintiff notes that the judgment provided that the Aetna and LMI policies were liable to indemnify Chemical Leaman "for the full amount of any and all costs of investigating and remediating" contamination at the Bridgeport terminal. Plaintiff asserts that the LMI in their appeal did not contest their obligation to indemnify for investigation costs, and that the Third Circuit's subsequent affirmance of the judgment "except as to the allocation of liability among applicable policies" has foreclosed any further challenge to the Court's ruling on this issue. The LMI counter that they appealed their liability for investigation costs in the form of appealing the joint and several liability component of the judgment.

■ Regardless of whether the LMI's appeal left in place a finding of LMI liability for any and all RI/FS costs, the Court is bound to revisit the RI/FS matter in the wake of the New Jersey Supreme Court's intervening March 1996 decision in *Fairclough.* The Court must conform its resolution of the RI/FS issue to New Jersey law as it exists at present, even if the state's law is

different than it was when the 1993 judgment order was entered. *Air Products and Chemicals, Inc. v. Hartford Accident & Indem. Co.,* 25 F.3d 177, 181 (3d Cir.1994) (citing *Vandenbark v. Owens–Illinois Glass Co.,* 311 U.S. 538, 543, 61 S.Ct. 347, 350, 85 L.Ed. 327 (1941)). The Third Circuit's affirmance except as to allocation among applicable policies was issued three months *after Fairclough,* but in the absence of a specific appellate challenge by the LMI regarding RI/FS costs the Third Circuit did not address the impact of this New Jersey Supreme Court decision. Accordingly, the Court does not read the Third Circuit's decision as mandating one application or another of *Fairclough* to this case.

In *Fairclough,* a CGL insurer sought a determination that its expenditures of response costs pursuant to New Jersey remediation investigation requirements constituted indemnity coverage exhausting the policy's indemnity limits, and not defense coverage. The carrier had stipulated with the insured that when the policy's indemnity limits were exceeded, the defense obligation expired. 672 A.2d at 1157–58. The trial judge agreed with the insurer, reasoning that the response costs were in the nature of damages under the CGL policy and were, therefore, indemnification costs, not defense costs. The New Jersey Appellate Division, however, reversed, holding that the costs of the investigations were defense costs under a policy provision that the insurer "may make such investigation and settlement of claim or suit as it deems expedient." *Id.* at 1158.

The New Jersey Supreme Court granted certification and reversed the Appellate Division's judgment. There should be a presumption, it ruled, that the costs of an RI/FS mandated by a government agency are indemnity costs. "The advantage of a blackletter rule is simplicity in administration.

---

7. The court in *Endicott Johnson* defined feasibility studies as "compris[ing] plans for selecting and implementing the remediation alternative for the site." 928 F.Supp. at 184. The New Jersey Supreme Court in *Fairclough* quoted at length an excerpt of a law review article providing a similar definition. 672 A.2d at 1156 (quoting Eglin & Straus, *supra,* at 388).

8. Remedial investigations, the court in *Endicott Johnson* stated, "address the sources and extent of the contamination, whether environmental damage can be mitigated by controlling the sources, or whether additional action is necessary because of migration of contaminants from the site." 928 F.Supp. at 184; *accord Fairclough,* 672 A.2d at 1156 (quoting Eglin & Straus, *supra,* at 388).

We must avoid, at all costs, another war of experts to determine how much of the costs should be allocated to defense and how much to indemnity." *Id.* at 1162.

The *Fairclough* presumption can only be overcome if the *policyholder* demonstrates that the insurance company has derived an unjust benefit from such an allocation to indemnity to the extent that it has relieved the insurance company of an expense that it would otherwise have incurred under its obligation to defend. If an insured sets forth evidence, in other words, that an RI/FS expenditure "clearly kills two birds with one stone in the sense of fulfilling a defense obligation while also relieving the policyholder of a potential claim for damages," a court should apply a variety of factors to develop a fair allocation of the RI/FS costs between defense and indemnity provisions of the given policy. *Id.*

The LMI interpret *Fairclough* as requiring a fair allocation of RI/FS costs between defense and indemnity in every case. Moreover, they assert that *Fairclough* ultimately failed to provide a black-letter rule on how to accomplish such a fair allocation, and that this Court should follow the approach taken in *Endicott Johnson, i.e.* treatment of feasibility-studies costs as indemnity and remedial-investigation costs as defense.

■ *Fairclough* is clear, however, that an RI/FS should only be allocated in part to defense if the insured shows that allocation to indemnity alone would provide a windfall to its insurance company. In the present case, the insured—Chemical Leaman—does not contest the presumption that all mandated RI/FS costs are indemnity costs, but in fact embraces the presumption. Accordingly, the Court rules that *all* of Chemical Leaman's mandated RI/FS investigation and remediation costs are indemnity costs subject to recovery under the indemnity provisions of the LMI policies.

b. *Recoverability of $45,000 Penalty*

■ The parties also disagree about the recoverability of $45,000 which Chemical

Leaman paid to the EPA on account of a penalty in November 1995.[9] The LMI contend that the $45,000 remittance by Chemical Leaman constituted payment of a penalty, and as such is unrecoverable under this Court's reasoning in *Township of Gloucester v. Maryland Cas. Co.,* 668 F.Supp. 394, 401–02 (D.N.J.1987) (Brotman, J.) (holding that defendant insurers were not obligated to indemnify plaintiff township for fines and penalties assessed by the State of New Jersey for violations of environmental regulations).

Chemical Leaman responds that it does not seek recovery from the LMI for the $45,000 penalty, because it has already been reimbursed by its environmental contractor, Geraghty & Miller ("G & M"). Chemical Leaman asserts that as a means of obtaining reimbursement from G & M, it deducted $45,000 from its payment of an October 1995 G & M invoice for Bridgeport work. According to the invoice, submitted as an exhibit, Chemical Leaman paid $48,066.82 in satisfaction of an invoice of $93,066.82 for services rendered.

Chemical Leaman states that the effect was the same as if G & M had paid the penalty directly to the EPA, and the tank truck company had paid the full amount of the G & M invoice (instead of subtracting the $45,000). Plaintiff therefore contends that the full amount of the G & M invoice—including the $45,000 offset—is a properly reimbursable indemnity cost.

The key question appears to be whether it can be properly said that in connection with the invoice in question, Chemical Leaman actually *incurred* the full invoice amount as an indemnifiable Bridgeport cleanup cost. Chemical Leaman essentially contends that it "paid" G & M $45,000 of the invoice amount in the form of paying the $45,000 penalty assessed against Chemical Leaman by the EPA. Notwithstanding any agreement between Chemical Leaman and G & M, the Court is unconvinced that Chemical Leaman's payment of the penalty to the EPA should be so interpreted for purposes of in-

---

**9.** Chemical Leaman reports that the EPA assessed the penalty as a result of a late submission.

demnification. Such an approach would functionally violate the bar on recovery of fines and penalties under the subject insurance policies. *Township of Gloucester,* 668 F.Supp. at 401–02. Accordingly, the Court deems as recoverable the $48,066.82 paid by Chemical Leaman to G & M on account of the October 1995 G & M invoice, but not the $45,000 paid by Chemical Leaman to the EPA on account of the 1995 penalty.

### 2. CALCULATION OF TOTAL RECOVERABLE PAST INDEMNITY COSTS

Having resolved the disputes between Chemical Leaman and the LMI regarding what categories of costs are recoverable from the LMI, the Court can turn to a discussion of the total recoverable past costs at issue in this litigation.[10] As directed by the Court, the LMI in October 1996 forwarded to Chemical Leaman an analysis of the cost invoices which plaintiff submitted to LMI for Bridgeport through September 1996. The analysis was prepared by an environmental consultant, Douglas Swanson, who served as an expert trial witness for the LMI in this case. Swanson classified the cost invoices into the three categories of contamination for which the judgment requires coverage: groundwater, soil, and wetlands (*See* LMI Oral Arg. Ex. D3 (cost summary spreadsheet)).

Chemical Leaman states that Swanson's aggregate past cost summaries for the three media "do not exactly match the costs that Chemical Leaman has submitted to the LMI," and that plaintiff inadvertently neglected to submit to the LMI certain invoices totalling "a relatively small amount of costs." (Pl.'s Reply Mem. on Alloc. Issues at 13–14 n. 13). Additionally, Chemical Leaman submitted documentation at oral argument of response costs invoiced after September 1996 totalling approximately $2.7 million. With these caveats, plaintiff otherwise accepts the LMI aggregate past cost summaries for Bridgeport as accurate.

**10.** The judgment affirmed by the Third Circuit establishes the LMI's liability for future response

#### a. Groundwater–Contamination Response Costs

Swanson allocated approximately $6.8 million—$6,796,041.76—to groundwater. Applying *Endicott Johnson,* Swanson classified $4,133,208.76 of the groundwater costs as recoverable indemnity costs; $1,465,932.47 as defense costs; and $1,187,219.55 as "uncertain" RI/FS costs, *i.e.* costs not clearly attributable to either remedial investigations or feasibility studies.

Additionally, Swanson identified $9,680.98 paid to Environmental Resources Management, Inc. ("ERM"), one of Chemical Leaman's environmental consultants, as unrecoverable because it was paid before the 1985 Chemical Leaman–EPA consent order. The LMI assert that at the outset of trial, Chemical Leaman stipulated that it would only seek to recover costs derived from the EPA's claim against Chemical Leaman. As a result, the LMI state, costs incurred before the entry of the consent decree establishing Chemical Leaman's obligation to perform the Bridgeport RI/FS are unrecoverable. Chemical Leaman has stipulated that it will forego its claim for these amounts.

In light of the Court's ruling that all RI/FS costs are recoverable indemnity expenses pursuant to *Fairclough,* the Court has determined that all of the $6,796,041.76 Swanson allocated to groundwater are recoverable indemnity costs, save for the $9,680.98 paid to ERM prior to the EPA consent order. Among the two invoices Chemical Leaman submitted at oral argument was a December 1996 invoice from the EPA for groundwater oversight costs, totaling $1,492,662.32. The Court deems the additional amount to be indemnity, and grants Chemical Leaman's request that it be considered in a calculation of past costs. Accordingly, the documentation submitted to the Court indicates a total, on the record, of $8,279,023.10 for Chemical Leaman's recoverable past costs related to groundwater contamination.

costs as well. See Section II.A.3. *infra.*

### b. *Soil–Contamination Response Costs*

Swanson allocated $1,544,332.10 to soil. The parties' submissions to the Court, evaluated in the context of the Court's rulings *supra* on cost allocation methodology, indicate that all of these monies are recoverable indemnity expenses, save for the following: 1) the $45,000 penalty payment by Chemical Leaman to the EPA, and 2) $10,510.81 in payments to ERM for services rendered prior to entry of the EPA consent order. Accordingly, the total, on the record, for past response costs related to soil contamination is $1,488,821.29.

### c. *Wetlands–Contamination Response Costs*

Swanson allocated $128,023.68 to wetlands. Swanson's report indicates that all of these costs are RI/FS costs, and, accordingly, the Court rules that all are recoverable indemnity expenses. The second of the two invoices presented by Chemical Leaman at oral argument was an October 1996 EPA invoice for $1,167,642.40 in costs incurred in development of an EPA Record of Decision for the wetlands. The Court deems the invoiced amount to be indemnity cost, and will include it in the calculation of past costs. Accordingly, the total, on the record, for past indemnity costs allocable to wetlands contamination is $1,295,666.08.

### d. *"Unclassified" Costs*

■ Swanson reports in his affidavit that a portion of the cost invoices submitted by Chemical Leaman were either incurred by the company's outside attorneys or by non-legal vendors whose description of services were insufficient to allow allocation to one of the three environmental media. These invoices total "unclassified" costs of $321,821.84. Chemical Leaman has stated that most of these costs—$279,509.50—are legal fees that are unrecoverable defense costs. The LMI have designated $1,754.70 as indemnity costs. Upon review of Swanson's

detailing and breakdown of the remaining invoices totalling $40,557.64, the Court allocates $18,960.94 of the invoiced costs to indemnity and deems $21,596.70 to be defense costs.[11] Given the Court's resolution of certain other issues *infra*, allocation of the $20,715.64 in "unclassified" indemnity costs among the environmental media will be unnecessary.

### e. *Total Bridgeport Past Indemnity Costs On the Record*

The Court has determined, therefore, that the total of Chemical Leaman's past Bridgeport indemnity costs on the record is $11,084,226, rounded from $11,084,226.11. The total does not include the invoices of "a relatively small amount" of past costs which Chemical Leaman says it inadvertently did not submit to the LMI for purposes of the LMI cost summaries. It does not include invoices received by Chemical Leaman *after* September 1996, save for the two substantial EPA invoices presented at oral argument.

Additionally, the Court notes that Chemical Leaman has indicated that there are relatively minor discrepancies between LMI's cost summaries and the costs which Chemical Leaman has submitted to the LMI. Chemical Leaman requests that resolution of these cost discrepancies not delay entry of an order establishing the amount that the LMI owe.

The Court agrees with plaintiff that resolution of minor cost disputes should not delay this Court's efforts to bring this litigation to a final resolution. Accordingly, the Court adopts the $11,084,226 total as the past-costs figure on the record for purposes of a reallocation of damages.

### 3. *PROJECTED RECOVERABLE FUTURE INDEMNITY COSTS*

Chemical Leaman represents that when it settled with Aetna in August 1995, it project-

---

**11.** The Court construes the entries for the $18,960.94 in invoices to reflect costs of developing the RI/FS. A portion of the $21,596.70 in defense costs reflects legal fees. The other portion—approximately $15,000—represents fees charged by ERM for consulting work in June and July 1989. One of the two ERM invoices is detailed in the Swanson summary as "Meetings with attorneys; response to EPA decision to take

over RI/FS." The other is detailed as "Development of response to EPA regarding take over of RI/FS." Chemical Leaman has not disputed these invoice summaries. While these consulting fees appear to be *related* to the RI/FS, the Court has concluded that they are not "mandated costs" as contemplated by the *Fairclough* presumption, but rather defense costs. *See Fairclough,* 672 A.2d at 1162.

ed the total cleanup costs for Bridgeport—apparently including both past and future costs—at slightly over $31 million. As is discussed further *infra*, plaintiff stated that it and Aetna used this projection in the course of determining the amount of the settlement to be allocated to Bridgeport as opposed to other sites. At oral argument in February 1997, however, Chemical Leaman presented a significantly greater revised estimate. The tank truck company's lead attorney in this litigation stated that "long-term it's estimated that the cleanup cost at this site will cost between 40 and 50 or $60 million, so the dollars that are owed [by the LMI] now are just the beginning of the money that will be owed." (Transcript of February 28, 1997 Oral Argument ("Tr.") at 5; *see also* Tr. at 151–52, 154 ("[F]uture costs plus the past costs we're talking perhaps 40, $50 million")).

Applying the range of Chemical Leaman's estimates, the Bridgeport cleanup will likely demand between $20 million and $50 million in future response costs over and above the approximately $11 million incurred to date. The Court expects that all of these future response costs will be indemnity costs, not defense costs. Ultimately at issue in this allocation proceeding, therefore, are monies on the order of $30 million to $60 million.

## B. LMI LIABILITY FOR PAYMENT OF INDEMNITY COSTS

### 1. *EFFECT OF AETNA SETTLEMENT*

The Court now turns to issues surrounding the source of payment of these monies. The most vigorously contested of these issues is the impact of the Aetna settlement on the LMI's payment obligations. Chemical Leaman asserts that the LMI excess policies

have attached as a result of the Aetna settlement, because Aetna paid "its full policy limits" totalling $11,055,000 on its 1960–81 primary policies found liable under the judgment. Chemical Leaman asserts that the stated policy limit for each triggered Aetna policy is not only a per-occurrence limit but also an *aggregate* limit.[12] Accordingly, plaintiff contends, the LMI policies attached for Bridgeport indemnification after Aetna's payment of only $5,226,750 for Bridgeport indemnity since Aetna paid more than $11,055,000 *in the aggregate* on this site and numerous *other* sites.[13]

Chemical Leaman represents that the settlement agreement allocated $5,226,750 to Bridgeport and $6,273,250 to its claims on these other sites based on the ratio of the projected total cleanup costs for a given site (or set of sites) to the estimated total cleanup costs for all of the sites. This allocation appears to be based on a premise that each of the non–Bridgeport claims—on which plaintiff brought suit in the Eastern District of Pennsylvania in 1994 following the judgment in this case—triggered a set of policy years similar to that in this case (at least for groundwater contamination), *i.e.* 1960–81.

The LMI argue that their policies have not yet attached for Bridgeport, because the settlement did not exhaust the 1960–81 Aetna policies for this site. They agree that these policies contain $11,055,000 in policy limits for Bridgeport, but maintain that these are strictly limits *per occurrence* and not aggregate limits. The LMI assert that Bridgeport should be considered an "occurrence" for purposes of the per-occurrence limits, and that the settlement-agreement allocation of only $5,226,750 to the Bridgeport claim did not exhaust the operative $11,055,000 limits for the Bridgeport "occurrence." The LMI

---

12. Chemical Leaman distinguishes between an aggregate policy limit and a per-occurrence policy limit as follows:

> An "aggregate" limit sets a cumulative amount of coverage for *all* claims of a particular type, whereas a "per-occurrence" limit sets a maximum amount payable on a particular claim, but does not impact the coverage available for other claims of the same type.

(Pl.'s Reply Mem. on Alloc. Issues at 7 n. 5.) The Court adopts Chemical Leaman's definitions as they relate to the Aetna and LMI policies and the

question of their coverage of the Bridgeport claim and Chemical Leaman claims on other sites.

13. The "Settlement Amount" represented in the settlement agreement is *$11,500,000, not $11,055,000.* While $11,055,000 of the Settlement Amount was said to be allocated to indemnity claims under the 1960–81 policies triggered in this litigation, $445,000 was allocated by the agreement to the 1959–60 and 1981–85 policies. (Pl.'s Mem. on Alloc. of Damages, Ex. B.)

contend that their policies will attach for Bridgeport only "when the $11,055,000 is paid at this [Bridgeport] site." (Tr. at 77).

The LMI separately argue that New Jersey's entire controversy doctrine [14] precludes Chemical Leaman from allocating part of the $11.5 million settlement amount to claims on sites other than Bridgeport. The LMI contend that Chemical Leaman should not be permitted to argue for the reasonableness of the allocations to other sites after electing to litigate only Bridgeport in this suit.

### a. *Exhaustion of the Triggered Aetna Policies*

As an initial matter, the Court must consult the Third Circuit's decision in this case for guidance regarding the Aetna settlement. The Court is bound, of course, to implement "both the letter and spirit" of the Third Circuit's mandate, "taking into account the appellate court's opinion and the circumstances it embraces." *Casey v. Planned Parenthood of Southeastern Pennsylvania,* 14 F.3d 848, 857 (3d Cir.) (Scirica, J.) (quoting *Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943, 949 (3d Cir.1985), *stay of mandate denied,* 510 U.S. 1309, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994)). The Court may consider as a matter of first impression only "those issues not expressly or implicitly disposed of by the appellate decision." *Id.*

The Third Circuit did not explicitly address the issues of whether the settlement exhausted the Aetna policies, and what kind of credit was appropriate. The parties did not raise these issues on appeal, if for no other reason than because the settlement occurred after oral argument. A close reading of the opinion and order, however, suggests that the Third Circuit implicitly decided the exhaustion issue. As re-

counted *supra,* the panel ultimately affirmed the Court's 1993 judgment:

> except as to the allocation of liability among applicable policies and the cause is remanded to the District Court for a reallocation of damages among applicable policies in accordance with the New Jersey Supreme Court's holding in *Owens–Illinois,* 650 A.2d at 993–95.

*Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.,* 89 F.3d 976, 997 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996). The Third Circuit's order leaves no doubt that Bridgeport indemnity liability has already attached to the "applicable policies."

The appellate court's opinion, in turn, makes clear that the only "applicable policies" are LMI policies. At the very outset of the opinion, the panel notes that after oral argument of the appeal, "Chemical Leaman and Aetna settled all claims arising from this dispute." *Chemical Leaman,* 89 F.3d at 983. The Court also states that "[b]ecause Aetna has withdrawn from this appeal, we need not discuss its policies." *Id.* at 981.

The panel then proceeds, throughout the opinion, to discuss the judgment of coverage liability only as it relates to the *LMI* policies. The Court recounts, for example, that this Court had "applied the continuous trigger theory, ruling all of the *LMI* 's policies from 1960 to 1985 had been triggered by the environmental contamination at the Bridgeport site, unless a policy exclusion barred coverage." *Id.* at 995 (emphasis added). After determining that the LMI's argument against this continuous trigger approach was meritless but that the intervening *Owens–Illinois* decision supplanted the joint and

---

14. The entire controversy doctrine is aimed at ensuring that aspects of a legal dispute occur in a single lawsuit. One element of the doctrine, generally known as claims joinder, mandates that parties in a given dispute present all affirmative claims and defenses arising out of that legal controversy. *Olds v. Donnelly,* 150 N.J. 424, 696 A.2d 633, 637 (1997) (citing *William Blanchard Co. v. Beach Concrete Co.,* 150 N.J.Super. 277, 375 A.2d 675, 683–84 (App.Div.1977)). As a general rule, claims joinder bars "a party who has elected to hold back from the first proceeding a related component of the controversy ...

from thereafter raising it in a subsequent proceeding." *Blanchard,* 375 A.2d at 683. The New Jersey Supreme Court recently determined that at least certain types of indemnity claims are within the reach of the entire controversy doctrine, but noted concern about the applicability of the doctrine to various types of insurance coverage litigation. *Harley Davidson Motor Co. v. Advance Die Casting, Inc.,* 150 N.J. 489, 696 A.2d 666, 669, 673 (1997) (citing Andrew T. Berry, *Application of the Entire Controversy Doctrine to Insurance Coverage Litigation: A Bridge Too Far,* 28 Rutgers L.J. 41 (1996)).

several liability approach applied in the 1993 judgment, the appellate court concludes:

> Because the New Jersey Supreme Court rejected joint and several liability in favor of a risk-based allocation of liability among applicable insurance policies in *Owens–Illinois*, we will remand this matter to the district court for a reallocation of liability between the insurers and among the triggered policies in accordance with *Owens–Illinois*.

*Id.* at 995. The Third Circuit's decision leaves no doubt that this reallocation is to be performed between London insurers and London policies which the panel confirmed were triggered for coverage purposes.

The Third Circuit's implicit ruling on exhaustion is consistent with the well-settled rule that settlement with a primary insurer "functionally 'exhausts' primary coverage and therefore triggers the excess policy." *Koppers Co. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440, 1454 (3d Cir.1996); *UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*, 276 N.J.Super. 52, 647 A.2d 182, 190–91 (Law Div.1994). Indeed, even if the Court believed the Third Circuit had left open an exhaustion determination, the Court would have independently reached the same conclusion.

### b. *LMI Credit for Aetna Settlement*

Having determined that the settlement exhausted the Aetna policies and that LMI policies have been triggered for coverage purposes, the Court now reaches the question of a settlement credit for the LMI. Chemical Leaman contends that the Court need not concern itself with the LMI's argument for a credit of full policy limits, because "the settlement amounts and the policy limits are the same in this case for all relevant years from 1960–81." (Pl.'s Reply Mem. on Alloc. of Damages at 8 n. 7). It is true that the stated settlement amount for Chemical Leaman's 1960–81 indemnification claims on *all* disputed sites was equal to the 1960–81 Aetna policy limits applicable to Bridgeport: $11,055,000. Chemical Leaman ultimately argues, however, that the LMI are only entitled to a credit for the *$5,226,750* allocated as a settlement amount for Bridgeport. Accordingly, the Court must address the LMI's

argument that if their policies have attached, they are entitled to a credit of the *full* Aetna policy limits applicable to Bridgeport, agreed to be $11,055,000.

■ The New Jersey Supreme Court has not yet resolved the issue of how to credit a settlement with an insurer in a continuous trigger coverage case such as this one. Accordingly, as a federal court sitting in diversity, this Court must do its best to predict how it would do so. *Pittston Co. v. Allianz Ins. Co.*, 124 F.3d 508, 516–17 (3d Cir.1997). In making this determination, the Court must give due consideration to decisions by the State of New Jersey's trial courts and Appellate Division, but need not give those decisions binding effect. *Id.* The Court must also "consider analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Koppers*, 98 F.3d at 1445. In predicting the future direction of New Jersey law, the Court must be sensitive to the doctrinal trends of the state, and the policies which inform prior relevant adjudications by New Jersey state courts. *Charles Shaid of Pennsylvania v. George Hyman Constr. Co.*, 947 F.Supp. 844, 852 (E.D.Pa.1996) (citing *Clark v. Modern Group Ltd.*, 9 F.3d 321, 327 (3d Cir.1993)).

The one published New Jersey state court decision directly on point is *UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*, 276 N.J.Super. 52, 647 A.2d 182 (Law Div.1994) (*"UMC"*). *UMC* was an environmental insurance coverage case fairly similar to the present matter. Plaintiff insureds sought coverage from various primary and excess insurers for claims against the plaintiffs arising out of pollution at sites around the country. After plaintiffs settled with certain defendant primary insurers, a non-settling excess insurer moved for disclosure of the settlement terms. The trial judge denied the motion. He ruled that an excess insurer has no need to know the terms of a settlement between a plaintiff insured and an underlying primary carrier, because an excess insurer:

is entitled to a credit, not from the primary carrier's settlement, but from the amount allocable to the primary under its policies. In other words, the excess carrier is entitled to a credit for the full amount of the primary carrier's coverage before it is required to pay any cleanup expense.

*UMC,* 647 A.2d at 190.

■ The *UMC* court was citing a widely-followed corollary to the doctrine that a settlement with a primary insurer exhausts the primary coverage. *Koppers,* 98 F.3d at 1454 (citing Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 13.04, at 575–77 (7th ed. 1994)). Under this approach, the settlement triggers an excess policy, but the insured forfeits any right to coverage of any dollar difference between the settlement amount and the primary policy's limits. "The excess insurer cannot be made liable for any part of this difference because the excess insurer never agreed to pay for losses below a specified floor (i.e. below the limits of the underlying primary policies)." *Id.* Courts have applied this doctrine because it incentivizes settlement and permits the policyholder to obtain the benefit of its bargain with excess insurers, while at the same time preventing the insured from securing a double recovery. *Id.*

*UMC* was decided several months before *Owens–Illinois,* but its approach is very much consistent with the New Jersey Supreme Court's landmark decision.[15] *Owens–Illinois* calls for proration of coverage liability among insurers "on the basis of policy limits, multiplied by years of coverage." *Owens–Illinois,* 650 A.2d at 993. The *UMC* approach credits a settlement on the basis of policy limits and years of coverage. The *Owens–Illinois* court notes that its decision leaves open the complexity of determining how primary and excess coverage is to be taken into account. *Id.* at 994. The *UMC* approach is sensitive to the distinction between primary and excess insurance. In sum, this solution is in line with the *Owens–Illinois* aim to "narrow the range of disputes and provide procedures better to resolve the disputes that remain." *Id.* at 996. The Court predicts that the New Jersey Supreme Court would adopt the *UMC* rule.

■ This case illustrates the fairness of crediting with full policy limits rather than with settlement amount. It would be inequitable to limit the LMI to a $5.23 million credit based on a settlement allocation of over $6 million to other sites not litigated in this case. Indeed, it would be contrary to at least the spirit of New Jersey's entire controversy doctrine. The Court is not in a position to properly evaluate the reasonableness of the allocation, in large part because the coverage claims on the other sites are not before this Court.[16] All of this would be true even if the Court found that the Aetna policy

---

**15.** Indeed, although this Court "do[es] not impute any precedential authority" to unpublished New Jersey state court decisions in deference to the state's court rules, *Brady v. Dept. of Personnel,* 149 N.J. 244, 693 A.2d 466, 475 (1997) (citing New Jersey Court Rule 1:36–3)), the Court is aware of decisions by three New Jersey state trial courts which have adopted the *UMC* approach in the course of applying *Owens–Illinois. Schering Corp. v. Evanston Ins. Co.,* No. UNN L 97311–88, slip op. (N.J.Super.Ct. Law Div., Jan. 24, 1995), *leave to appeal denied,* No. AM–000762–94T1 (N.J.Super.Ct. App.Div., May 9, 1995), *leave to appeal denied,* No. M–1433/1434/1435/1436 (N.J., July 13, 1995) (quoting *UMC,* 647 A.2d at 182); *Crown Cork & Seal Co. v. Aetna Cas. and Sur. Co.,* No. HUD–L–007456–88, slip op. at 28 (N.J.Super.Ct. Law Div., Nov. 9, 1995; *Universal Rundle v. American Motorists Ins. Co.,* No. L–06892–94 (N.J.Super.Ct. Law Div.)(cited in Eugene Killian, Jr. and Carl A. Salisbury, *Don't Let Insurers Off the Hook,* 148 N.J.L.J. 1024–25 (June 9, 1997)).

**16.** In fact, before the trial of this matter the Court granted a motion *in limine* by Chemical Leaman to exclude all evidence proffered by the defendant insurers relating to pollution at Chemical Leaman sites other than the Bridgeport facility. *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.,* 788 F.Supp. 846 (D.N.J.1993), *aff'd,* 89 F.3d 976, *cert. denied,,.—— U.S. ——,* 117 S.Ct. 485, 136 L.Ed.2d 379 (1996). In support of its motion, plaintiff had argued that "[a]lthough Chemical Leaman operated at least 50 other facilities during the relevant time period, this case involves none of those other facilities." (Pl.'s Mem. in Support of its Motion *in Limine,* dated Feb. 5, 1993, at 10). The Court granted the motion pursuant to Federal Rule of Evidence 403, finding that the probative value of the other-site evidence was substantially outweighed by the danger of unfair prejudice, jury confusion, and undue waste of time. The Third Circuit affirmed this Court's ruling. *Chemical Leaman,* 89 F.3d at 994.

limits applicable to Bridgeport were also aggregate limits.

■ Accordingly, the LMI policies are entitled to a credit for the full amount of Aetna's Bridgeport per-occurrence coverage for the triggered policy years before they are required to pay any of Chemical Leaman's cleanup costs for the site. It is undisputed that the full Aetna per-occurrence policy limits applicable to Bridgeport total $11,055,000, regardless of whether these are also aggregate limits.[17] Thus, the LMI are liable for only those past and future Bridgeport indemnity costs in excess of $11,055,000. Remarkably, the settlement credit matches almost exactly the total past indemnity costs on the record: $11,084,226. *See* Section II.A.2. *supra*. Accordingly, all of the subject LMI policies' apportioned liability, save for approximately $30,000, will be for the projected $20 million to $50 million in *future* response costs.

### 2. POLICIES SUBJECT TO ALLOCATION

The Court next considers the LMI's argument that in accordance with *Owens–Illinois*, Chemical Leaman should absorb a portion of its past and future indemnity costs related to soil and wetlands contamination, based on the liability-phase determinations that pollution exclusion clauses in the 1971–81 policies bar coverage for soil and wetlands damage for those years.

The Court agrees with Chemical Leaman that the Third Circuit has already ruled against any allocation back to the plaintiff insured on account of the pollution exclusion clauses. As stated *supra*, the Third Circuit affirmed the Court's judgment of liability as to the LMI policies except as to allocation of damages among the LMI insurers. Whereas the judgment had held the LMI and now-exhausted Aetna policies jointly and severally liable for all of Chemical Leaman's Bridgeport indemnity costs, the Third Circuit remanded for a reallocation of liability "between the [London Market] insurers and among the triggered [London Market] policies in accordance with *Owens–Illinois*." *Chemical Leaman*, 89 F.3d at 995.

By "triggered policies," the Third Circuit clearly meant those policies which were found by the judgment to cover response costs for contamination to a given environmental medium: groundwater, soil, or wetlands. The Third Circuit did *not* intend to include as a "triggered policy" for a given medium an LMI policy where a pollution exclusion clause applied. Notably, the Third Circuit recounted that this Court had ruled that "all of the LMI's policies from 1960 to 1985 had been triggered by the environmental contamination at the Bridgeport site, *unless* a policy exclusion barred coverage." *Id.* (emphasis added). An examination of the appellate court's opinion makes clear, therefore, that the Third Circuit intended an allocation of all of Chemical Leaman's groundwater-contamination response costs beyond Aetna coverage to the LMI policies covering 1960–1981; all soil indemnity costs beyond the Aetna insurance to the 1960–71 LMI policies; and all wetlands costs beyond the primary coverage to the 1961–71 LMI policies.

### 3. ALLOCATION OF DAMAGES AMONG TRIGGERED POLICIES

The Court finally turns to the question of how Bridgeport indemnity costs are to be allocated among the LMI policies pursuant to *Owens–Illinois*. As the Third Circuit explained, the New Jersey Supreme Court in *Owens–Illinois* "held a fair method of alloca-

---

17. The Court need not, and does not, reach the issue of whether the Aetna policies contain aggregate limits applicable to the Bridgeport contamination equal to the Bridgeport per-occurrence limits. Relatedly, the Court does not address LMI's argument that if pre–1965 Aetna policies are read to contain aggregate limits applicable to environmental contamination, then the LMI excess policies overlying them have aggregate limits as well. These aggregate-limits arguments are not relevant to the

*Owens–Illinois* allocation under the circumstances of this single-site case. The parties will clearly be prepared to make their arguments in the Eastern District of Pennsylvania litigation on the other sites. Attorneys for the parties informed this Court at oral argument that the other-site case is before the Hon. Edmund V. Ludwig, United States District Judge, and is currently on the suspense calendar pending this Court's allocation determination regarding Bridgeport.

tion appears to be one that is related both to time on the risk and the risk assumed, *i.e.*, proration on the basis of policy limits, multiplied by years of coverage." *Chemical Leaman*, 89 F.3d at 995 (citations omitted). In so holding, the *Owens–Illinois* court expressly adopted the risk-based allocation formula developed in *Armstrong World Indus., Inc. v. Aetna Cas. and Sur. Co.*, 26 Cal.Rptr.2d 35 (Cal.Ct.App.1993), *review granted and opinion superseded sub. nom. In re Asbestos Ins. Coverage Cases*, 866 P.2d 1311, 27 Cal. Rptr.2d 488 (Cal.1994), *review transferred to Court of Appeal sub. nom. In re Asbestos Ins. Coverage Cases*, 904 P.2d 370, 46 Cal. Rptr.2d 174 (1995), *decsn. after transfer*, 45 Cal.App.4th 1, 52 Cal.Rptr.2d 690 (1996), *review denied* (Aug. 21, 1996) ("*Armstrong* ").[18] *Owens–Illinois*, 650 A.2d at 993.

The New Jersey Supreme Court explained the *Armstrong* method using a hypothetical in which the continuous trigger theory activated office-building owners' CGL policies spanning nine years for coverage of asbestos-related injury claims filed by building workers. The policyholders' coverage profile in one of the scenarios posited by *Owens–Illinois* under this example was as follows: During each of the first three years, the insureds were covered under CGL policies for $2 million per occurrence per year. During each of the middle three years, policies were in effect at $3 million per year. During the last three years, the building owners were uninsured; for allocation purposes, the *Owens–Illinois* court said the risk assumed by the owners for these final three years was $4 million per year. Under the *Armstrong* method as interpreted by the New Jersey Supreme Court, "[c]arriers during the first three years would bear roughly twenty-two percent (6/27ths) [of the covered losses], carriers covering the middle three years would bear thirty-three percent (9/27ths); and the building owners would bear forty-four percent of

the risk (12/27ths). Of course, policy limits and exclusions must be taken into account." *Owens–Illinois*, 650 A.2d at 979–980, 994.

### a. Allocation Among Layers of LMI Policies

An important *Owens–Illinois* issue about which the parties disagree is how indemnity costs should be allocated among various layers of insurance. The LMI argue that each layer of liable coverage must "horizontally exhaust," *i.e.* that the underlying layer must be exhausted across *all* of the triggered policy years before the next layer would begin paying. Chemical Leaman, by contrast, argues that the *Owens–Illinois* method divides damages among triggered policy *years*, and that the attachment point for a given excess policy will depend on the amount of damages allocated to that year and the limits of the underlying policy.

■■■ The parties' arguments on this point focus on the issue of exhaustion of the Aetna primary policies in the *Owens–Illinois* proration scheme. This question has been mooted by the Court's treatment of the settlement *supra*. Moreover, *Owens–Illinois* mandates that neither the Aetna policies nor their limits should be included in the proration because they will not be called on for future contribution in the wake of the settlement. *See Owens–Illinois*, 650 A.2d at 994 ("[W]e are informed that Aetna has paid its policy limits for the years 1963 to 1977, so that Aetna's policy proceeds will not be called upon for future contribution. If that be so, rather than go back to revisit Aetna's contributions, we shall start forward. . . .").

■■ The parties' same arguments, however, apply to the important issue of exhaustion of each layer of LMI *excess* insurance. That is, the Court must determine whether each layer of liable *excess* coverage must horizontally exhaust before the next layer

---

**18.** Some months after the New Jersey Supreme Court issued *Owens–Illinois*, the California Supreme Court vacated the California Court of Appeal decision in *Armstrong* which affirmed the California Superior Court allocation method adopted by the *Owens–Illinois* court. The Court of Appeal decision was vacated and remanded for reconsideration in light of an intervening California Supreme Court decision. Following remand, the Court of Appeal issued a decision almost identical to its original opinion, and reaffirmed its approval of the allocation method. *Armstrong World Industries, Inc. v. Aetna Cas. and Sur. Co.*, 45 Cal.App.4th 1, 51–55, 52 Cal. Rptr.2d 690 (1996), *review denied* (Aug. 21, 1996) (noting that *Owens–Illinois* proposes "the same method of allocation").

would respond. This is a central question in this case, because the triggered LMI policies for purposes of liability allocation are arrayed across a number of layers. In policy year 1970–71, for example, there are three layers of LMI excess policies overlying the exhausted Aetna primary policy for that year.

The *Owens–Illinois* court did not directly resolve this issue, and acknowledged as much. The New Jersey Supreme Court stated:

> We realize that many complexities encumber the solution that we suggest involving, as it does, proration by time and degree of risk assumed—for example, determining how primary and excess coverage is to be taken into account or the order in which policies are triggered. *See* Hickman & DeYoung, *supra*, at 310–11; Roger Westendorf & Ronald R. Robinson, *Insurance Coverage for Environmental Claims Under the Comprehensive General Liability Policy, in* Pollution Liability: Managing the Challenges of Coverage and Defense in 1991, at 57 (ALI–ABA Video Law Review Study, Q205, 1991), *available in* WESTLAW, ALI–ABA Database, *54–57 (each discussing various theories of horizontal and vertical stacking and relationship to excess coverage issues). The parties did not focus on these issues. Still, we do not believe that the issues are unmanageable.

*Owens–Illinois*, 650 A.2d at 994.

The state supreme court did, however, provide some indications as to the appropriateness of horizontal exhaustion. It is notable that in the example it provided of how its method would operate, it allocated damages to "the carriers on the risk" for a given three-year period according to a ratio of the amount of the total of the per-occurrence limits in each of the three years to the total per-occurrence limits for all of the triggered years.

Chemical Leaman is correct, therefore, that the *Owens–Illinois* court called for a division of damages among the triggered policy *years*. The *Owens–Illinois* method intentionally assigns a greater portion of indemnity costs to years in which greater amounts of insurance were purchased, based on the view that this measure of allocation is more consistent with the economic realities of risk retention and risk transfer. A year-by-year increase in policy limits, the New Jersey Supreme Court suggests, may well reflect an increasing awareness of the escalating nature of the risks sought to be transferred. *Owens–Illinois*, 650 A.2d at 993.

Accordingly, the Court rejects the LMI's argument that horizontal exhaustion of liable policies is required.[19] Instead, the Court directs apportionment of damages among policy years without reference to the layering of policies in the triggered years. Given that there are different sets of triggered years for the three different media, costs classified as groundwater, soil and wetlands will be allocated according to medium. Thus groundwater costs will be allocated among the 1960–81 years; soil costs will be allocated among the 1960–71 years; and wetlands costs will be allocated among the 1961–71 years.

Groundwater-cost proration among triggered years, for example, will work as follows: The Court having concluded that the total LMI coverage for Bridgeport between 1960–81 is $415,225,000,[20] and that LMI poli-

---

**19.** While the Court does not impute precedential weight to the Appellate Division's recent decision—submitted by the attorneys for the LMI, to their credit—finding horizontal exhaustion inconsistent with *Owens–Illinois*, it notes that New Jersey's intermediate appellate court has taken a view similar to that of this Court. *Carter–Wallace, Inc. v. Admiral Ins. Co.*, A–3558–95T3 (N.J.Super.Ct.App.Div., May 15, 1997), slip op. at 15–20 (discussed in D. Jeffrey Campbell and Charles J. Stoia, *Panel Hands Victory to Policyholders*, 148 N.J.L.J. 1022–23 (June 9, 1997)). Before the Appellate Division's *Carter–Wallace* decision, at least two state trial courts had applied horizontal exhaustion in some form to *Ow-*ens–Illinois allocation in unpublished decisions. *See Schering*, slip op. at 5–10; *Crown Cork*, slip op. at 27.

**20.** The Court has determined this total based on a review of exhibits presented at oral argument. (LMI Oral Arg. Exs. D1 (coverage chart), D2, Tab 3 (coverage-profile spreadsheet), and D4 (spreadsheet listing insolvent and non-sued companies subscribing to London Market policies insured to Chemical Leaman); Pl.'s Oral Arg. Exs. P1, P2, P3 (charts with proposed percentages for *Owens–Illinois* allocation among liable policy years for the three environmental media)). The Court's total is $3 million less than the total calculated

cies are in effect for 1960–61 at limits of $1,225,000, the LMI policies for 1960–61 will bear .29% of the groundwater indemnity costs above the LMI's $11,055,000 settlement credit against all Bridgeport indemnity. Since LMI policies were in effect for 1980–81 at $59,000,000, by contrast, these policies will bear 14.21% of the groundwater costs allocated to the LMI policies. Apportionment to the other policy years will proceed according to this model.

■ Though it rejects horizontal exhaustion, the Court will take into account the layering of the LMI policies in any given policy year by directing that any indemnity costs allocated to that year be applied against the lowest-layer LMI policy not yet exhausted in that year. Stated another way, each layer of excess coverage in a given year must exhaust before the next layer will be required to begin paying indemnity costs to Chemical Leaman. For example, suppose $1.4 million in groundwater contamination indemnity costs are ultimately allocated to the LMI policies in the 1970–71 policy year, which will bear 4.70% of the groundwater costs allocable to the LMI policies.[21] For reasons the Court will discuss in subsection II.B.3.b. *infra,* the first-layer LMI excess policy for 1970–71 has a $1 million operative Bridgeport limit for this policy year, the second-layer policy has an operative limit of $8.5 million for the year, and the third-layer policy has a limit of $10 million. (LMI Ex. D1; LMI Ex. D2; Tab 3; Pl.'s Ex. P1). Therefore, the first-layer policy would be allocated $1 million and be exhausted, the second-layer policy would attach and incur a payment obligation of $400,000, and the third-layer policy would not attach for Bridgeport unless the 1970–71 policy year was allocated a substantial amount of soil and wetlands response costs.

### b. *Annualization of Per–Occurrence Limits*

■ Another dispute between the parties concerns the application of the LMI policies' per-occurrence limits to the *Owens–Illinois* allocation. Chemical Leaman does not dispute the LMI's argument that a single per-occurrence limit exists in each LMI policy, even those policies with stated policy terms greater than one year. But plaintiff contends it is entitled to coverage up to the per-occurrence limit in each triggered year of every penetrated LMI policy. Plaintiff argues that the Third Circuit's decision in this case mandates treatment of continuous and indivisible property damage such as at Bridgeport as separate and distinct occurrences in each of the years of a liable CGL policy. The LMI responds that the Third Circuit directs treatment of the Bridgeport contamination as a single, continuous occurrence spanning triggered policy years.

Chemical Leaman notes that at the beginning of its discussion of the continuous trigger theory, the Third Circuit stated the following:

> The New Jersey Supreme Court adopted the "continuous trigger" theory to identify the time of an "occurrence" in *Owens–Illinois, Inc. v. United Ins. Co.* The continuous trigger theory recognizes that "when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy."

*Chemical Leaman,* 89 F.3d at 994–95 (citations omitted) (quoting *Owens–Illinois,* 650 A.2d at 974, 995). Through this statement, Chemical Leaman asserts, the Third Circuit expressly adopted a determination in *Owens–Illinois* that progressive property damage is

---

by Chemical Leaman. Plaintiff reports the total LMI limits for the 1971–1977 policy years at $20 million per year, but an examination of Chemical Leaman's coverage profile for these years indicates that the total operative Bridgeport limits of the 1971–77 layers in which the LMI participated are $19.5 million per year. (LMI Oral Arg. Exs. D2, Tab 3 and D4.) See subsection II.B.3.b. *infra* with regard to the Court's determination of the

operative Bridgeport limits of each layer for each policy year, including layers covering a policy period longer than one year.

**21.** Approximately $1.4 million of groundwater indemnity costs would ultimately be allocated to the 1970–71 policy year if future groundwater response costs totalled roughly $30 million.

to be treated as separate occurrences in each of the triggered years of a triggered insurance policy, regardless of whether that policy covers one year or three years. Plaintiff contends that the Third Circuit's quotation of *Owens–Illinois* should be held to resolve the number-of-occurrences issue in part "because at the time of the Third Circuit's decision, the only policies left before the Court were the LMI policies [since] Aetna settled, and the Third Circuit was very well aware that these were multiyear policies." (Tr. at 105).

Notwithstanding the impact of this holding on the LMI's multi-year policies, plaintiff states, defendant insurers did not seek rehearing on this aspect of the Third Circuit's decision. As a result, the insured concludes, the appellate court's determination is the law of the case and the LMI are now barred from disputing that Chemical Leaman is entitled to recover up to the per-occurrence limit of each attached LMI policy for each triggered policy year.

The LMI argue for a much different reading of the Third Circuit's decision. They cite the following portion of the appellate opinion, later in the Third Circuit's discussion of the continuous trigger theory and *Owens–Illinois* allocation:

> Although considering the issue before the New Jersey Supreme Court's decision in *Owens–Illinois*, the district court applied the continuous trigger theory, ruling all of the LMI's policies from 1960 through 1985 had been triggered by the environmental contamination at the Bridgeport site, unless a policy exclusion barred coverage. The district court also held that all insurance policies activated by a continuing occurrence are jointly and severally liable to policy limits for property damage resulting from the occurrence.

*Chemical Leaman*, 89 F.3d at 995 (citation omitted). Relying on this passage, defendant insurers contend that the Court of Appeals accepted a premise in *Owens–Illinois* that property damage like that at issue in this case should be treated as one single, continuous occurrence.

This Court has determined that the Third Circuit has not definitively ruled, either expressly or implicitly, on whether the Bridge-port contamination should be treated as one occurrence or as a separate occurrence in each year for purposes of applying the LMI policies' per-occurrence limits. Accordingly, the Court will consider the issue as a matter of first impression. *Casey*, 14 F.3d at 857.

As recounted above, the New Jersey Supreme Court in *Owens–Illinois* held that under the continuous trigger theory it was propounding, progressive indivisible property damage should be treated "as an occurrence within each of the years of a CGL policy." *Owens–Illinois*, 650 A.2d at 995. On its face, this language appears to direct treatment of progressive property damage as *distinct* occurrences triggering per-occurrence limits in each year of a policy. Furthermore, a consideration of the context of this statement leads the Court to conclude that this is in fact the proper construction of *Owens–Illinois*. The Court considers both the continuous-trigger discussion and the allocation discussion in *Owens–Illinois*, because the New Jersey Supreme Court determined that the two issues were inextricably linked; "[W]e believe," the *Owens–Illinois* court explains, "that common-law resolution of the trigger-of-coverage issue requires that we consider, at the same time, the issue of scope of coverage if a policy is triggered." *Owens–Illinois*, 650 A.2d at 985.

The *Owens–Illinois* court relies very heavily throughout its opinion on *Armstrong*; indeed, as related *supra*, the New Jersey Supreme Court expressly adopted in full the *Armstrong* allocation formula. The *Armstrong* trial court's elaboration of the formula, in the context of asbestos-related bodily injury claims, clearly reflects and responds to an underlying premise that injury should be treated as distinct occurrences activating per-occurrence limits in every triggered policy year. For the sake of context, the *Armstrong* trial court's statement of the allocation method embraced by *Owens–Illinois* will be quoted at length:

> "This Court finds that the most equitable method of allocation is proration on the basis of policy limits, multiplied by years of coverage. This method is consistent with the policy language in that it takes policy limits into consideration ... This method

also reflects the fact that higher premiums are generally paid for higher 'per person' or 'per occurrence' limits. *Since some policies are in effect for more than one year, and injury occurs during every year from first exposure to asbestos until death (Phase III decision at p. 42), multiplying the policy limits by years of coverage results in a more equitable allocation than proration based on policy limits alone.* Thus, when a particular claim triggers more than one policy, each insurer's share of liability shall be determined by the proportion that each policy's applicable 'per occurrence' limits multiplied by years the policy was in effect bears to the sum total of the applicable 'per occurrence' limits of all triggered policies multiplied by the years each policy was in effect. When a policy does not contain a 'per occurrence' limit, the 'per person' limit shall be used in this calculation."

*Armstrong,* 26 Cal.Rptr.2d at 57 (quoting unpublished Superior Court allocation decision it affirmed) (emphasis added).

The *Armstrong* trial judge, the Hon. Ira Brown of the California Superior Court, San Francisco County, had concluded that a continuous trigger should apply to the bodily injury claims. He reached that conclusion, however, through an "injury-in-fact" analysis. *Id.* at 52. As *Owens–Illinois* states, "the 'injury in fact' (or 'damages in fact') approach . . . holds that coverage is triggered by a showing of actual injury or damage-producing event." *Owens–Illinois,* 650 A.2d at 981. Judge Brown determined that the damaging physiological processes associated with the inhalation of asbestos begin almost immediately upon exposure, but that *"new and additional* 'bodily injury' from asbestos continues to occur even past the cessation of exposure," throughout an affected individual's life. *Armstrong,* 26 Cal.Rptr.2d at 52–53 (emphasis added). Thus, when Judge Brown stated in the course of allocation that "injury occurs during every year from first exposure to asbestos until death," *id.* at 57, he clearly

was referring to discrete and separate injury in every year.

Quoting the *Armstrong* allocation language *supra,* a leading treatise cites the decision as supporting payment of per-occurrence limits for each year of a multi-year policy. Ostrager & Newman, *supra,* § 9.04. This Court agrees with the treatise's interpretation. Further, the Court believes that *Owens–Illinois* should not be read as diverging from *Armstrong* in this respect.[22] Accordingly, the Court directs that in the allocation for each of the three Bridgeport contamination media, attached LMI policies of greater than one year are liable up to their respective per-occurrence limits for a separate occurrence during each triggered policy year in which they were on the risk.

### c. Allocation of Damages to Insolvent Insurers

Chemical Leaman and the LMI disagree also about who should bear the risk of insolvencies among subscribers to LMI policies. Citing policy terms, the LMI argue that each subscribing syndicate at Lloyd's of London, and each subscribing London Market Company that participated in a liable policy at issue in this case, is only *severally* liable for its share of that policy. Accordingly, the LMI contend, Chemical Leaman will have to bear any loss attributable to the policy shares of insolvent LMI carriers. Chemical Leaman disagrees, arguing that effectuation of the principles embodied in *Owens–Illinois* will be better served by requiring solvent LMI insurers to spread this loss among themselves.

The terms of the LMI policies purchased by Chemical Leaman clearly set forth the *several* nature of subscribing insurers' coverage obligation. Standard-form LMI policy language provides:

> Now know Ye that We the Underwriters, Members of the Syndicates whose definitive numbers in the after-mentioned List of Underwriting Members of Lloyd's are set out in the attached Table, hereby Bind

---

**22.** In support of their argument the LMI have cited *Diamond Shamrock Chemicals Co. v. Aetna Cas. and Sur. Co.,* 258 N.J.Super. 167, 609 A.2d 440, 468–69 (App.Div.1992), in which the Appellate Division directed payment of only one per-

occurrence limit for each three-year excess policy. *Diamond Shamrock* predated *Owens–Illinois,* however. Moreover, it applied New York law. The Court declines to follow *Diamond Shamrock* on this issue.

ourselves, each for his own part and not one for another, our Heirs, Executors and Administrators and in respect of his due proportion only, to pay or make good to the Assured ...

(Certif. of Adam M. Smith in Opp'n to Pl.'s Mem. on Alloc. of Damages, Ex. 7.) Moreover, LMI policies list the percentage of risk assumed by each subscriber.

Nothing in *Owens–Illinois* mandates that the Court should ignore these policy terms and rule that the solvent subscribers to an attached policy have to pay the insolvent insurers' proportionate shares. In fact, *Owens–Illinois* directs an allocation of damages "subject to policy limits and exclusions." *Owens–Illinois,* 650 A.2d at 994–995. An allocation recognizing the several liability of solvent insurers takes into account a significant LMI policy limitation. The Court predicts that the New Jersey Supreme Court would adopt this approach, consistent with the interpretation of LMI policies employed by other courts around the country. *See, e.g., Arkansas–Oklahoma Gas Corp. v. Lukis Stewart Price Forbes & Co., Ltd.,* 306 Ark. 425, 816 S.W.2d 571, 573–77 (1991).

Acknowledging the several-liability policy language, Chemical Leaman proposes that the Court could simply order that each attached LMI policy will be deemed exhausted when its solvent subscribers have paid their proportionate share of the policy limits and Chemical Leaman has absorbed the cost of the shares of any insurers not named in this litigation. If, for example, eighty percent of subscribers to a triggered LMI policy with policy limits of $500,000 were insolvent, the next-layer excess policy would attach upon the solvent insurers' payment of $100,000. Chemical Leaman argues that this would accomplish the policy objectives of *Owens–Illinois* by "not saddling a policyholder which transferred its risks with unforeseen costs of insolvent insurers ... while not contravening the individual [LMI] defendant's limited liability in the quota-share policies."[23] Chemical Leaman also submits that such an ap-

proach would balance against a "windfall" which plaintiff said *Owens–Illinois* gave to excess insurers by allocating damages among all triggered policy years.

Chemical Leaman essentially contends that upper-layer excess carriers should assume the risk of insurer insolvency in underlying LMI policies. In *Werner Industries, Inc. v. First State Ins. Co.,* 112 N.J. 30, 548 A.2d 188 (1988), an insured was unsuccessful with a remarkably similar argument. There the policyholder argued that its excess policy should "drop down" to become the first line of coverage for risks insured by a primary carrier which had become insolvent. The policy terms of the excess policy were functionally identical to the LMI terms. Applying the fundamental insurance-law principle of fulfilling the objectively reasonable expectations of the parties, the *Werner* court concluded that the language of the excess policy plainly did not provide drop-down coverage in the event of the primary insurer's insolvency. The New Jersey Supreme Court also concluded that, on the record provided, the excess policy was not inconsistent with public expectations or commercially accepted standards: "It is difficult for us to see in this scenario of events anything other than a litigation strategy designed to make the best of a bad situation.... [W]e cannot conclude that it was within the commercial expectations of Werner Industries that its umbrella carrier was to be its primary carrier in case of that carrier's insolvency." *Werner,* 548 A.2d at 192. The *Werner* treatment of the drop-down issue followed the clear majority rule. *See* 2 Allan D. Windt, *Insurance Claims & Disputes* § 6.45 (3d ed.1995) (collecting cases).

This Court does not read the New Jersey Supreme Court's *Owens–Illinois* decision six years later as overruling *Werner.* In fact, the attention paid by the state high court to policy limits and exclusions in *Owens–Illinois* is consistent with its approach in *Werner.* LMI carriers shall not bear losses attributable to the policy shares of insolvent LMI subscribers.

---

23. In *Owens–Illinois,* Chemical Leaman notes, the New Jersey Supreme Court recognized that it was reasonable to expect the insured to share in the risk-based damage allocation only "[w]hen

periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available." *Owens–Illinois,* 650 A.2d at 995.

## III. *CONCLUSION*

For the reasons stated above, this Court has reached the following determination:

1) Bridgeport RI/FS costs are to be considered indemnity costs.

2) The total, on the record, of past costs for Bridgeport indemnity is $11,084,226.

3) Chemical Leaman's settlement with Aetna exhausted the Aetna coverage for Bridgeport. The LMI are entitled to a credit of $11,055,000, the total of the triggered Aetna policies' full per-occurrence policy limits for Bridgeport indemnity, on account of the settlement.

4) No damages shall be allocated back to Chemical Leaman on account of the pollution exclusion clauses in the April 1, 1971 to April 1, 1981 LMI policies. Any and all Bridgeport indemnity costs over and above the $11,055,000 settlement credit are to be allocated to the policy years found liable under the judgment: 1960–71 for costs of investigating and remediating soil contamination; 1961–71 for costs of investigating and remediating wetlands contamination; and 1960–81 for costs of investigating and remediating groundwater contamination.

5) The $29,226 in past indemnity costs over and above the settlement credit reflects the remaining amount from the December 1996 EPA groundwater oversight costs invoice after past costs reached the credit total of $11,055,000. Accordingly, the full total of $29,226 in past indemnity costs for which LMI policies are liable shall be allocated among the policy years triggered for groundwater cleanup coverage: 1960–81. Regardless of whether it has the discretionary authority to award prejudgment interest on this relatively small amount under *Ellmex Const. Co. v. Republic Ins. Co.*, 202 N.J.Super. 195, 494 A.2d 339, 349 (App.Div.1985), the Court will not do so. Counsel for Chemical Leaman, in fact, indicated at oral argument in February 1997 that Chemical Leaman had not yet paid the invoice but rather was intending to rely on payment by the LMI.

6) The Court rejects horizontal exhaustion. However, each layer of excess coverage in a given policy year must exhaust before the next layer will be required to begin paying indemnity costs.

7) In the allocation for each of the three Bridgeport contamination media, attached LMI policies of greater than one year are liable up to their per-occurrence limit for a separate occurrence during each triggered policy year in which they were on the risk.

8) No LMI carrier shall bear losses attributable to the policy shares of insolvent LMI subscribers or subscribers not named by plaintiff in this matter, or losses attributable to layer shares of non–LMI policies under which plaintiff has not sought coverage in this matter.

The Court will refer Chemical Leaman's application for attorney's fees to Magistrate Judge Rosen for a Report and Recommendation.

An appropriate order will be entered.

### ORDER ON REALLOCATION OF DAMAGES

The Court of Appeals for the Third Circuit having affirmed the 1993 judgment order of this Court in the above captioned matter in an order dated June 20, 1996, "except as to the allocation of liability among applicable policies;"

The Court of Appeals having remanded the matter to this Court "for a reallocation of damages among applicable policies in accordance with the New Jersey Supreme Court's holding in *Owens–Illinois*, 138 N.J. 437, 650 A.2d 974, 993–95 (1994);"

This Court having received and reviewed submissions from plaintiff Chemical Leaman Tank Lines, Inc. ("Chemical Leaman") and defendant London Market Insurers ("LMI"), and having heard oral argument on reallocation of damages and on plaintiff's application for attorneys' fees and expenses;

For the reasons set forth in the Court's opinion of this date;

**IT IS** on this **12th day of September, 1997** hereby **ORDERED:**

1) Chemical Leaman is entitled to apportioned indemnification and reimburse-

ment from defendant London Market Insurers under each and every policy of insurance they provided to Chemical Leaman during the period April 1, 1960 to April 1, 1971 for the full amount of any and all future costs of investigating and remediating **soil contamination** (including all mandated investigation and remediation costs associated with a Remedial Investigation/Feasibility Study (RI/FS)) at and in the vicinity of its Bridgeport, New Jersey, tank truck terminal resulting from the United States Environmental Protection Agen-

cy's claims against Chemical Leaman. Future investigation and remediation costs are defined as all investigation and remediation costs not reflected in the corrected Affidavit of Douglas J. Swanson in Support of London Market Insurers' Opposition Brief on Allocation Issues, filed on October 18, 1996 (hereinafter the "Swanson Affidavit").

Costs are to be apportioned among the April 1, 1960 to April 1, 1971 London Market policies covering such policy years according to the following percentages:

| Policy Year | Applicable LMI Limits | Percentage |
|---|---|---|
| 1960–61 | $1,225,000 | .93% |
| 1961–62 | $4,500,000 | 3.43% |
| 1962–63 | $9,500,000 | 7.24% |
| 1963–64 | $9,500,000 | 7.24% |
| 1964–65 | $9,500,000 | 7.24% |
| 1965–66 | $9,500,000 | 7.24% |
| 1966–67 | $9,500,000 | 7.24% |
| 1967–68 | $19,500,000 | 14.86% |
| 1968–69 | $19,500,000 | 14.86% |
| 1969–70 | $19,500,000 | 14.86% |
| 1970–71 | $19,500,000 | 14.86% |
| TOTALS | $131,225,000 | 100% |

London Market insurers that provided coverage to Chemical Leaman in a given policy year among the 1960–71 policy years therefore have apportioned liability in accordance with the limits of their policies for soil-related investigation and remediation costs referred to above, including investigation and remedial costs for damage occurring before and after a specific policy year.

2) Chemical Leaman is entitled to apportioned indemnification and reimbursement from defendant London Market Insurers under each and every policy of insurance they provided to Chemical Leaman during the period April 1, 1960 to April 1, 1981 for $29,226 in past costs, and the full amount of any and all future costs, of investigating and remediating **groundwater contamination** (including all mandated investigation

and remediation costs associated with a Remedial Investigation/Feasibility Study (RI/FS)) at and in the vicinity of its Bridgeport, New Jersey, tank truck terminal resulting from the United States Environmental Protection Agency's claims against Chemical Leaman. Future investigation and remediation costs are defined as all investigation and remediation costs not reflected in the Swanson Affidavit, with the exception of the $1,492,662.32 in costs invoiced in a communication from the Federal Environmental Protection Agency ("EPA") presented by plaintiff as an exhibit at oral argument on allocation.

Costs are to be apportioned among the April 1, 1960 to April 1, 1981 London Market policies covering such policy years according to the following percentages:

| Policy Year | Applicable LMI Limits | Percentage |
|---|---|---|
| 1960–61 | $1,225,000 | .29% |
| 1961–62 | $4,500,000 | 1.08% |
| 1962–63 | $9,500,000 | 2.29% |
| 1963–64 | $9,500,000 | 2.29% |
| 1964–65 | $9,500,000 | 2.29% |
| 1965–66 | $9,500,000 | 2.29% |
| 1966–67 | $9,500,000 | 2.29% |
| 1967–68 | $19,500,000 | 4.70% |
| 1968–69 | $19,500,000 | 4.70% |
| 1969–70 | $19,500,000 | 4.70% |
| 1970–71 | $19,500,000 | 4.70% |
| 1971–72 | $19,500,000 | 4.70% |
| 1972–73 | $19,500,000 | 4.70% |
| 1973–74 | $19,500,000 | 4.70% |
| 1974–75 | $19,500,000 | 4.70% |
| 1975–76 | $19,500,000 | 4.70% |
| 1976–77 | $19,500,000 | 4.70% |
| 1977–78 | $19,500,000 | 4.70% |
| 1978–79 | $39,500,000 | 9.32% |
| 1979–80 | $49,000,000 | 11.80% |
| 1980–81 | $59,000,000 | 14.21% |
| TOTALS | $415,225,000 | 100% |

London Market insurers that provided coverage to Chemical Leaman in a given policy year among the 1960–81 policy years therefore have apportioned liability in accordance with the limits of their policies for groundwater-related investigation and remediation costs referred to above, including investigation and remedial costs for damage occurring before and after a specific policy year.

3) Chemical Leaman is entitled to apportioned indemnification and reimbursement from defendant London Market Insurers under each and every policy of insurance they provided to Chemical Leaman during the period April 1, 1961 to April 1, 1971 for the full amount of any and all future costs of investigating and remediating **wetlands contamination** (including all mandated investigation and remediation costs associated with a Remedial Investigation/Feasibility Study (RI/FS)) at and in the vicinity of its Bridgeport, New Jersey, tank truck terminal resulting from the United States Environmental Protection Agency's claims against Chemical Leaman. Future investigation and remediation costs are defined as all investigation and remediation costs not reflected in the Swanson Affidavit.

Costs are to be apportioned among the April 1, 1961 to April 1, 1971 London Market policies covering such policy years according to the following percentages:

| Policy Year | Applicable LMI Limits | Percentage |
|---|---|---|
| 1961–62 | $4,500,000 | 3.46% |
| 1962–63 | $9,500,000 | 7.31% |
| 1963–64 | $9,500,000 | 7.31% |
| 1964–65 | $9,500,000 | 7.31% |
| 1965–66 | $9,500,000 | 7.31% |
| 1966–67 | $9,500,000 | 7.31% |
| 1967–68 | $19,500,000 | 15.00% |
| 1968–69 | $19,500,000 | 15.00% |
| 1969–70 | $19,500,000 | 15.00% |
| 1970–71 | $19,500,000 | 15.00% |
| TOTALS | $130,000,000 | 100% |

London Market insurers that provided coverage to Chemical Leaman in a given policy year among the 1961–71 policy years therefore have apportioned liability in accordance with the limits of their policies for wetlands-related investigation and remediation costs referred to above, including investigation and remedial costs for damage occurring before and after a specific policy year.

**IT IS FURTHER ORDERED:**

1) Horizontal exhaustion is rejected; however, each layer of excess coverage in a given policy year must exhaust before the next layer will be required to begin paying costs of investigating and remediating contamination.

2) Attached LMI policies of greater than one year are liable up to their per-occurrence limits for a separate occurrence during each triggered policy year in which they were on the risk.

3) No LMI carrier shall bear losses attributable to the policy shares of insolvent LMI subscribers or subscribers not named by plaintiff in this matter, or losses attributable to layer shares of non–LMI policies under which plaintiff has not sought coverage in this matter.

4) This allocation reflects an $11,055,000 settlement credit against the defendant London Market Insurers' indemnity obligation on account of Chemical Leaman's August 1995 settlement of all claims arising in this dispute with Aetna Casualty and Surety Company ("Aetna").

5) Chemical Leaman's application for attorney's fees and expenses is referred to the Hon. Joel B. Rosen, United States Magistrate Judge, for a Report and Recommendation.